The next case and the last case call for a large number of people to present as Conkle. Council. Please support Council. My name is Brian. Represent the defendant appellant, Charles H. Conkle. In the case of the people, the state of Illinois versus charged Conkle out of Hardin County, Illinois, which was tried before the Honorable Don Foster. Initially, my first issue deals with, I'll start with a statement of basically of the facts and circumstances. Mr. Conkle was charged with attempted murder, aggravated battery with a firearm. In the shooting, it was lying. An incident that took place in Hardin County in 2007. The parties had had a, it's a four-wheel rodeo, I guess is what, I wasn't real sure what it was initially. But in essence, what it is, is exactly that. It's a rodeo with four wheels, so instead of horses. So they had that all day long. The testimony was that they had each consumed, they had 230 packs of beer that started out that day. And there was hardly any left. They did give some away. But the two of them, they drank the vast majority. And that was the testimony from both sides as to what had taken place. They both consumed a tremendous amount of alcohol. When they got home, there was some sort of a discussion, an altercation. At some point in time, a gun was picked up by Mr. Conkle. And Mrs. Conkle was shot through the neck. It didn't hit any vital organs or did not hit any things of that sort. He immediately called 911. They came. She was treated and released shortly thereafter. It was the contention of the defendant that the gun accidentally went off. But it was not his intention to shoot her. He never had an intention to shoot her. And no time did. And for some reason, in his statements to the Illinois State Police that were given, he makes the statement so that, you know, I lifted it up and it went off and it just shot and various other types of ways of saying it was an accident in essence. But the first argument I have deals with the fact that on behalf of the defendant, I filed a motion to continue the trial date. The defendant was incarcerated during the entirety of the time pending trial. It had been continued on more than one occasion. A couple times at the defendant's request. I believe the state's attorney had even requested a continuance at one point in time, which was all granted with no objections at any point in time. It was ultimately set in October. And my client, while he was in custody and awaiting trial in this case, a divorce proceeding had taken place. It was taking place as well. Ultimately, we were attempting to hire an expert, a firearms expert, to review the gun, look at the gun, make a determination if in fact this gun could, in fact, be fired accidentally. The state's attorney's office did have experts from the Illinois State Police and their forensic units talking about the safety mechanisms that were on the gun that was used in the shooting and had all that evidence. It took a considerable period of time for my client and his family to come up with the money as they had to hire an attorney. There was another expert, Mr. Alva Bush, who was hired also as the scene accident reconstructionist under the circumstances. As well as, I'll get in later, additional things that I believe he was qualified to be an expert in that the court refused to do. So, on behalf of the defendant, the motion is filed. We sought leave of the court to continue the case. It is true. Judge Foster was retiring by way of, I believe, the advanced stage where he could no longer file, go for retention at that point in time, so his term in office as a circuit judge was ending. As of December 1st, the state's attorney did not seek re-election and he was, as well, leaving on December 1st. That is a factual part of this case. Roger Ralph, who was the incoming state's attorney as he was running unopposed, he was going to be elected, was present and there because it was anticipated, even with the trial date of October, that potentially the sentencing, if he were to be found guilty, would possibly have to be done with a different judge or maybe even a different state's attorney. That was anticipated and thought of by the parties already as Mr. Ralph was present. In this motion to continue, it was advised to the court that Mr. Keighton in Missouri was unavailable, could not be there at the time the case was already set for trial. Asked for three weeks of a continuance for him to finalize a report provided to the state's attorney's office and have it go before trial, merely contradicting things that were stated by the prosecution's expert as it relates to the weapon and the safety features. In essence, it would have still been tried while Judge Foster was still on the bench, while the state's attorney was still in office. It would not have gone past that. That was all that was requested. The Honorable Judge Foster denied the motion and said that if I wanted, I could bring Mr. Keighton there at trial and he could come tell the judge why he couldn't be there at trial. As I stand here, I don't know who has practiced. I don't know if they went on the bench and had the opportunity to practice in front of Judge Foster, but it wasn't an opportunity to say, well, Judge, that defies logic. I'm telling you here because I've spoken to him that my expert can't be here on the day of trial. So since he can't be here because he has to be somewhere else, I can't bring him here that day. That wasn't an option to explain that at that point in time and there wasn't an opportunity to do that. My motion was denied and we were going to trial. At this point in time, had the proposed expert, had he examined the gun? Had he formed any conclusions? He had not formed any conclusions at that time. The reason being was he could not be retained prior to that. He had and had advised me that he would be able to review the actual weapon and the reports. He had the reports, but he wanted to look at the weapon, which was the last thing he wanted to do, which that was nearly going to require him to drive down to Hardin County to look at it. But I think he had the reports, so he'd already had basically everything that the prosecution had down that he was going to write a finalized report. And that's talking about the safety features. And was any of that conveyed to the court? It was conveyed to the court. My recollection was that the court was conveyed to him that he would be able to finalize the report. He just needed to view the gun to finalize it, that he would be available three weeks later to testify and be there to testify and present all the evidence that the defendant needed at that point. The court denied that, and the case then proceeded to trial. I will assert that the FLE, on behalf of the state, that the issue was not brought back up at trial concerning the Setzberg. The motion was denied at that point. There was no offer of proof for the simple fact that at that point in time, the financial status of paying at that point in time for the expert to finalize the report, which was several thousand dollars to complete one that was going to be done, at this point, useless, because it could not be done at the date of trial. My expert already stated that he couldn't have it done by the date of trial, and he wouldn't be available as of the date of that trial. So at that point in time, it seemed superfluous to go ahead and have him complete a report at that point in time, and it did not happen. We would ask the court to overturn his conviction, stating that that motion to continue of asking for just three weeks was not prejudicial to anyone. It wasn't prejudicial to the prosecution. It wasn't prejudicial to the court and the court's docket at that point in time. It had not been in any urgency of the prosecution to try the case at any point in time. Three weeks still allowed it to be tried, because it only took five days to try. No one anticipated it would take much longer than that. It was going to be tried still within the court's term on the bench, as well as the state's terms. So the only person who was prejudiced was the defendant who was prejudiced and no one else at that point in time. And the crux of the whole case really turned on him. Could this gun be shot accidentally or not? I mean, at the end of the day, it was irrefuted that they had an argument, that the gun was pulled out, that it was there. Really, what the crux of the case came down to, could it be an accident? And that was what I believe our expert, in his initial, I think, review of some documentation, I ultimately believe that's what the testimony would have been. That's not part of the record, though. Is there anything in the record that shows that the expert would have contradicted the state's experts? There was nothing ever ultimately part of the record, so I can't assert that it's part of the record. What I can say is that the defendant's motion to continue, while I believe timely under the circumstances and certainly non-prejudicially, one was, in fact, denied. The second argument deals with the motion to suppress. The standard there being, was it manifestly erroneous? And the denial of the motion to suppress. And in that, my client, there was statements made that he had drank a tremendous amount of alcohol on the day in question. The Illinois State Police brought him in. And it was also unrefuted that my client had an inability to read and or write the English language. He was brought into an interrogation room. And the Illinois State Police read the Miranda warnings. And then he proceeded to give a statement, which he was unable to write. They asked him to write it down, which he stated he could not. And then the officer himself stated that he wrote down, and in his testimony, the motion to suppress, that he wrote it down word for word and then said, is this what you said? Well, my client was incapable of reading or writing. That signed what was placed before him at that point in time. His blood, he asked for a breathalyzer at one point in time, approximately 1 a.m., several hours after the incident, I believe, a while after he was taken into custody, approximately over an hour. He still had a .101 blood alcohol content at that point in time. And he had not been drinking at that point for several hours at that point in time. We would ask the court to overturn the court's finding that his waiver of his Miranda warnings and his statement to the police at that point in time were proper and knowing under the circumstances. The third argument, and I will really place this together with another argument later being the fifth argument, I'll argue them together for the court as they really are intertwined, and that as it relates to the expert of the defendant being Albert Bush. Albert Bush worked for the Illinois State Police for 20-plus years. He had gone out into private practice as an investigator as well as in various other offices that he held doing certain items. In working with the Illinois State Police, he testified before the court that he had, on a number of occasions, in multiples of, I believe, over 500 times, he had, in fact, viewed crime scenes, the evidence that was contained therein. In addition to that, he had worked very closely with pathologists and other individuals in bullet wounds and their death. He had read specifically one treatise that I was citing and basically laying the foundation for my client to be admitted as an expert while not possessing the actual degree to make him an expert in wounds or in how a wound can happen and the trajectory of a bullet entry into a wound. He had, by practical experience, done that, which is what I was attempting to do to place before the court his experience in showing the court that. He talked about a treatise, a book, and Mr. Bush was testifying that he had actually worked with the son and the author of the book and spent a considerable period of time viewing those wounds that are talked about in the treatise that is commonly used in that area of determining the angle of bullet wounds and things of that sort, at which point the court, without any objection by the prosecution or anyone else, stated that's what – I'll paraphrase it slightly here, but the exact words are in the brief. It said that's all very good, Mr. Drew, that's very nice, but that's irrelevant here. Without any objection by the prosecution, without any statements on my behalf to the court or anything else, then at that point in time when I proceeded to ask the court to admit him as an expert, the court – it gets a little fuzzy as to what he did or didn't do. I asked him for, by way of accident reconstructions, to be admitted as an expert. Then in addition, also in the areas of the wound itself and the entry of a bullet and things of that sort, and the court said he was admitting him as an expert to some extent but not others, but he can go ahead and testify. And the way it was done, to be honest, to this day I'm not even sure what he was qualified in as an expert before the court. The court just said, well, you can go ahead and testify, and basically the state didn't make many more objections after that. So he proceeded to testify on a whole number of items. Did he testify and was he asked about the ability of this particular weapon to be fired accidentally in the circumstances that were outlined by the testimony? Well, Mr. Bush really wasn't – he wasn't an expert in weapons. I think he did – I don't remember – I don't believe he talked any great length at all about the safety items on the weapon. He knew about them. I got some of that out through the prosecution's expert of what safety items were on a gun, what there could be, what there was, what wasn't on this particular weapon, but not anything of any great detail. Mainly, his was – there was contention by the victim that she was on her knees begging for her life with her hand up, asking him not to shoot her. And in essence, Mr. Bush was there testifying that by the angle of the wound, the burn pattern of the entry of the bullet itself, as well as the view of the room of the bullet, the actual bullet was never found. It was through and through her neck, and it was never actually found in the home anywhere. So the determination – he came in to testify that she could not have been on her knees whenever he fired – when the weapon was actually fired, and that was the biggest part of his testimony of what he was there about. Part of that was a requirement to have knowledge and an understanding of wound entries and bullet and burn patterns on wounds as it enters into the skin of the body, so you can determine what angles those were. That was in essence what Mr. Bush was there about. After – I attempted to put Mr. Bush forward as an expert in a number of different fields that he had a tremendous amount of expertise and experience in. After the court's statement of that's very nice, Mr. Drew, but that's irrelevant here, the court then actually physically turned his chair away from facing forward, turned it toward the witness, which he did not do with any of the prosecution's witnesses, and proceeded to – every time if any objection was made or if Mr. Bush said I'm not sure what you're saying, counsel. The court would – his face was red, his hands went up. It was the body language of what it was, and I cite in my brief that he had body language. You can't see it on the record, but I mean he was turned towards it. And you can see in there some of his statements that just answer the question. It's a simple question. Why don't you just go ahead and answer the question? This isn't hard. And the court proceeded to berate Mr. Bush for basically all his testimony periodically, would make statements. And when you tie that together with the court's animosity that originated in his statements to myself on behalf of my expert, and then in addition his continuing of doing that throughout it, his refusal to allow him to come in as an expert in all the fields or at least allow him to lay a foundation as to what it was, which I attempted to do more than once and asked the court to do. In essence, he eviscerated my expert. I mean I have an expert here. It got to the point where even the prosecution at the end goes this guy wasn't even qualified to be an expert here and testify today because he could say that by the time the court got done with my expert when he was, I believe, eminently qualified. I mean his curriculum, his expertise and all that he had done. For some reason, the court was very antagonistic towards my expert and in essence I believe removed the ability of my client to have a fair trial under the circumstances. Whenever you put all of that together under the circumstances. In addition, we have an argument in there about two things. One, that there was insufficient evidence presented by the prosecution to prove my client guilty beyond a reasonable doubt. Ultimately he was found not guilty of attempted murder, but he was found guilty of aggravated battery with a firearm. And under the circumstances, we argue that there was not sufficient evidence presented by the prosecution to show that there was any intentional act on behalf of my client. Voluntary intoxication not being a valid defense to say that you didn't have the requisite mental state to do it. But I think the factual evidence that was presented concerning her alleged statement of what happened here that it would happen. She came in the door and he was chasing her and he immediately shot her. I was directly refuted because she had on a hat and shoes that ultimately in pictures of the home, which was in the exact state as it was the night of the shooting. There were the tennis shoes that she had on placed neatly sitting there, the hat that she had on placed on there. There were clothes piled up, which she said she was leaving, which is what actually brought about the argument between the parties concerning that. And in addition to that, the expert testimony completely refuted her allegations of being on her knees and begging for her life at the time when the gun actually went off. So I believe there was insufficient evidence under the circumstances to prove him guilty. Finally, and I'll be very brief on this, we believe my client's sentence to 15 years in the Illinois Department of Corrections was in fact an abusive restriction. And we have cited the case law there and the facts and the circumstances under that. And I won't belabor that other than to the extent that I think the court's overall demeanor in the actual prosecution of this case and the trying of this case. I think put it placed in a position where my client was sentenced far harsher than I think what he might be otherwise. Although his sentence was in the middle range of what he potentially could have been sentenced to. So for all those reasons, we would ask that specifically for the denial motion to continue that the actual conviction of my client be overturned and the cause remanded for a new trial. Or in the alternative that in fact the denial of accepting the expert and the statements of the court towards that expert basically denied my client a fair trial and would ask to be remanded as well. Thank you. Thank you, Counsel. This case has been set for trial three previous times. Twice continued on defense motion. Once continued because the defense has filed a motion to suppress statements, which was filed after the time for filing pre-trial motions. So the case is set for trial October 27th. On October 20th, the defense counsel comes into court and says he wants to continue that case for the presence of John C. Clayton, allegedly a firearms expert. Now, at that point, Clayton's name had never been furnished to the prosecution in discovery. The prosecution had not received any description of Mr. Clayton's qualifications. There were no reports of Mr. Clayton furnished to the prosecution or the court. And there couldn't be because John Clayton had never examined the evidence in the case. Now, and to this day, he hasn't examined the evidence in the case. I mean, perhaps we can assume that because he was a hired gun, his testimony would have been useful to the defendant, but that would be unduly cynical. If he was an honest man, he would have agreed with the testimony of firearms examiner James Hall that it required an 11-pound trigger pull to fire the gun in the double action mode. That is, if he didn't cock the trigger, and four pounds if he did cock the trigger, because those are absolutely typical figures for an ordinary revolver. Indeed, I expect there were people in a Hardin County jury who knew them without hearing from any expert. But the defendant wanted to continue the case to 13 days before the expiration of the judge's term and the state's attorney's term. Now, four of those days have to be knocked out as weekend days, and two have to be knocked out because of the Thanksgiving holiday. So he wanted to continue the case to when there were seven trial days available before the end of the judge's term. Now, as it turned out, this case was tried in, I guess, in less than that, five trial days or something in that nature. But nobody knew that was the case, that would necessarily be the case. I mean, things happened during trials. The continuance requested by the defendant carried a considerable potential for the judge suddenly stopping to be a judge in the middle of the trial, and the state's attorney suddenly stopping to be a state's attorney. I mean, of course, continuance is discretionary, but it seems to me that the factors here against the continuance were overwhelming. Three previous continuances disclosed by the defense. An expert, alleged expert, whose name has never been furnished in discovery to the prosecution at the time the motion for continuance was made. He was finally listed as a witness two days after the motion for continuance, but even then there was no description of what his testimony would be. An alleged expert who had no reports to furnish to the other side, who couldn't form an opinion because he hadn't yet examined the evidence. And they requested continued days, which might not have been feasible, because, of course, the state's attorney, having no notice of this motion for continuance before the day it was made, had no idea whether his witnesses, many of whom were experts from outside of Hardin County, or some of whom were experts from outside of Hardin County, would be available on their requested continued date. And finally, a continued date which really no prudent judge would want to set, because of the potential for the term of office of both the judge and the state's attorney expiring right in the middle of trial. Now, I mean, all those factors indicate that the judge did not abuse his discretion, but even if you question the judge's decision, under Illinois law, you don't have a basis for overturning it, because you have no idea what this Mr. Clayton was going to testify to. As I say, in my opinion, if he was an honest man, he would have agreed with Mr. Hall. But we don't know. Mr. Clayton doesn't know. He never saw the guy. The alleged financial stringency which caused the absence of any indication of what Mr. Clayton might have testified to was never advanced to the trial court as a reason. And finally, on that issue, the judge didn't really deny the motion for continuance. What he said was, you bring in Mr. Clayton to explain why he can't be here on the trial date, because the record contains no explanation. I mean, was Clayton planning on a vacation in Florida? Was he under subpoena in some other case? Did he just feel he wanted more time to consider it? We don't know. And so the judge wanted to know, and he said, he didn't say bring Clayton in on the trial date. He said, bring Clayton into the court to explain why he can't be present during the trial. After all, there were, as I said, seven court days available for trial, suggested continued date. And there was no reason advanced why Clayton couldn't be available on any of them. We don't know what Clayton would have said. We don't know why Clayton was supposedly unavailable. There's no basis for overturning the judge's ruling on the continuance. Now, on the motion to suppress, there were three witnesses who testified in that, not including defendant. In fact, not including any witness associated with the defense. There was one deputy sheriff, or one ex-deputy sheriff, and two Illinois State Troopers. Now, all of them said that this defendant was clear and coherent, understood every question put to him. Insisted on his rights when he wanted to. It was when he agreed to consent to a search, only if he could be present during the search. And the statement to the two Illinois State police sergeants was actually recorded on a CD, which was admitted in evidence, heard by the jury, but is not part of the record on appeal. The judge listened to it before ruling on the motion to suppress. So all the evidence in the record indicates that this man was clear and coherent, and understood every question that was put to him in his statement. And the judge, presumably, agreed with that after listening to the very words of the defendant in the statement that mattered. There's no basis for overturning that decision, because this court cannot listen to that hour-plus long statement, because it doesn't have the CD that the trial judge had, and the jury had. So, all the evidence indicates someone who understood his rights, understood what he was doing, understood the questions, made a voluntary statement. All the evidence in the record, and probably all the evidence that isn't in the record, since the prosecution offered the CD of the oral statement to the state police sergeants, both with a motion to suppress and a trial. Now, the only evidence of intoxication is that immediately after the statement to the state police sergeants, this defendant, at his own suggestion, underwent a breathalyzer test and blew .101. Now, that's over the legal limit for driving of .8, but it's not a level which makes a person incapable of understanding or talking. His reaction time was probably slow, but as, admittedly, a very experienced drinker, he probably, well, not probably, I would say, as the evidence shows, that he was still able to understand enough to answer all the questions put to him and to understand the Miranda warnings. I've cited cases in my brief indicating that intoxication far more extreme than that is not sufficient to show a statement to be involuntary. Now, on the question of the expertise of the defense expert, Alvin Bush, the jury knew everything about Alvin Bush's background and experience because he testified to it. The jury heard every opinion and conclusion of Alvin Bush that the defense cared to offer. There were no objections to his opinions and conclusions, and no objections sustained, of course, to those nonexistent. Since there were no objections, there were none sustained. Everything that the defense wanted Alvin Bush to say, he said. The court ruled that Alvin Bush was an expert, but the only specific ruling as to expertise by the trial judge was that he wasn't an expert in forensic pathology. Now, this court knows that to be an expert in forensic pathology, you have to have an MD degree and special instruction and experience in autopsies or at least the analysis of disease and wounds. Alvin Bush had no medical training at all, and while he had observed autopsies, he certainly never performed one or never been responsible for reaching conclusions about a cause of death or anything related to it. So I would say the ruling that Alvin Bush was not an expert in forensic pathology was entirely the right one. But what matters is what the jury heard. The jury heard everything this court has heard and more about Alvin Bush's background as a crime scene investigator for the state police, so the jury knew what his expertise was and what it wasn't. And the jury heard every opinion and conclusion of Alvin Bush that the defense asked him to make because the people didn't object and the judge, of course, let it in. Now, with respect to the comments of the trial judge, it must be remembered that when Alvin Bush testified as to his expertise, and it was a contentious matter at that point,  the judge had to decide whether Alvin Bush was an expert. Everyone agreed that he was an expert on crime scene investigation, but whether he had expertise in other fields. And so when the judge told defense counsel that something wasn't relevant, that was entirely appropriate because it was an issue in which the judge had to decide, and the judge had to determine what was relevant. And the specific thing that the judge said wasn't relevant was that Alvin Bush had once read a book by an expert in forensic pathology and had worked on a case with that expert's son, which hardly established him as an expert in forensic pathology. If reading a book on forensic pathology makes someone an expert, then I'm an expert. I'll go around charging $100 an hour for my testimony because I've read a number of books on forensic pathology, but I would never pretend to be an expert in the field. Now, Alvin Bush, as I said, the jury heard everything that the defense wanted them to hear from him, but he proved to be a remarkably evasive or, shall we say, unforthcoming witness on cross-examination. He was asked a number of very simple questions related directly to what he testified to on direct examination but simply refused to answer them or evaded them, and the judge told him on several different occasions to answer the question. If you would read the transcript, you will see that it's a clear pattern of a witness who testified clearly on the subject on direct examination, simply refusing to answer questions on cross-examination, and the judge, if he's going to run the court and have a fair trial, has a duty to admonish a witness to answer a question when the witness refuses to do so. So the rulings of the judge in this case were entirely understandable in each case and I would suggest didn't prejudice any legitimate interest of the defendant. The defendant didn't have any inherent right to add a new expert to a case a week before trial after three continuances, especially when the witness had never been named in discovery, never filed a report, never examined the evidence. All the evidence in the motion to suppress indicated that this witness was competent to waive his Miranda rights and answer questions. The defense expert was allowed to testify to everything that the defense wanted to question him about, and the judge in his comments simply told defense counsel what was relevant to establishing someone's expertise in the field of forensic pathology and admonished a witness to answer the question, all of which were proper if the judge is to be something more than an idol at the top of the bench and is actually going to move the case to a conclusion. So for these reasons, we ask that the conviction be affirmed. Thank you, counsel. As it relates to continuance, the case was set for October 20th. I asked for a three-week continuance. I proposed a date, which would have been towards the end, but it would have been well within the court's discretion to say we're not going that long. He can't be here the week of the 20th, the week of the 27th. We're going to start it on this date and we'll roll over until a week when he can be here. He can either be here or he can't be here, Mr. Drew, at that point. But I didn't get any of those options laid before the defendant at that one time. It was simply a no, and your expert can come here during the week of trial when the court was already advised he couldn't be there. But if he came there, he could explain to him why he couldn't be there. What was alleged as to why he couldn't be there? I believe it was just his work schedule. He was unabated. I don't think it's clear on the record exactly what that was. And really, to be honest, I don't think the court – the court wasn't asking to ascertain why he couldn't be there because he didn't say bring him here tomorrow or we'll continue this for a day or a day after. It was bring him back during the week of the trial and said he couldn't be here. And he can tell me – he can tell this court here while the trial is going on why he couldn't be here at a time when he's already told he couldn't be there. So I don't think that was ever the intention of the court to afford an opportunity for the defendant's expert to come and explain why he wasn't going to be there. And as it relates to Mr. Bush, the key – I think part of the key is in exactly what he was qualified in. The judge said, well, I'm going to allow him as an expert as an accident reconstructionist, but not anything to do with ballistics, blood splatter, or anything else. I'm not allowing anything as an expert as it relates to any of that. And yet he had testimony out what Bush did, not just that he read a book one time and did one case. That was a specific example, that he had done over 500 murder and other investigations for the Illinois State Police over a 20-plus year career of analyzing crime scenes, of analyzing evidence, of analyzing wounds. He had seen over 500 wounds and had analyzed them as it relates to their entry, as it relates to bullets and knife wounds, various other things he had done, and had some layperson expertise in that area. We weren't asking him to be a criminal pathologist and say why someone died. Merely to come in and testify as an expert as to path entries of wounds based on this accident reconstruction and crime scene investigation that he did. The court was specific to say only the collection of evidence is what he's an expert in. Well, I mean him being an expert in the collection of evidence, I mean I'm not sure what benefit that had to the defense at all. And yet the court was very specific about it. And then when you tie that together with the court's, I believe, antagonistic attitude towards Mr. Bush repeatedly throughout the case is unsolicited statements to myself while questioning Mr. Bush. And I've been before many courts before where I'm attempting to lay a foundation in the court system. You need to move on, counsel, or can you approach – in a jury trial, can you approach, you know, let's – this area didn't do it any good. You need to get me somewhere we can get. But it wasn't the case. It was unsolicited from the bench in front of the jury and then proceeded on with everything else. And the problem is to take one specific incident of the court out of the context of which it was in and say, well, look, this didn't do it, and then grab a different single incident and say, well, look, this didn't prejudice the defendant. But it wasn't that. It was the totality in the trial of his antagonistic attitude towards Mr. Bush, his expert opinion, that I think severely prejudiced the defendant because it did so much so that the prosecution himself was very happy to say in his closing that this court refuses to accept Mr. Bush as an expert and he's not going to. And he enjoyed saying it because it does have an effect and it has a prejudicial effect on a defendant. We would ask that this be overturned.  Thank you, counsel. We appreciate the briefs and arguments. Counsel, take the case under advisement.